IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

EDWIN M. FRANKLIN

:

v.                          : Civil Action No. DKC 2005-0489

:

MONTGOMERY COUNTY, MD, et al.

:

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this civil rights case are a motion by Defendants Montgomery County, Maryland, Montgomery County Police Chief J. Thomas Manger, in his official capacity,[1] and Montgomery County Police Officers Steve Smugeresky, Robert T. Lumsden, and Sandra Moss, all individually and in their official capacities, for summary judgment (paper 32) and a cross-motion by Plaintiff, Edwin M. Franklin, for summary judgment (papers 33 and 37).  In addition, Plaintiff filed a motion for the court to take judicial notice of a video tape. (Paper 39).  The issues have been fully briefed and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, Defendants' motion for summary judgment will be granted in part and denied in part and Plaintiff's cross-motion for summary judgment will be denied.  Plaintiff's motion for judicial notice will be denied.

_____

[1]  In the caption of his complaint, Plaintiff names Chief Manger in his individual and official capacity.  In his opposition to Defendants' motion for summary judgment, however, Plaintiff concedes that Chief Manger is sued in his official capacity only.

## I.   Background

## A.   Factual Background

### 1. The Undisputed Facts

Unless otherwise stated, the following facts are uncontroverted.  An agreement existed between the local homeowners' association, the North Village Homes Corporation (Homeowners' Association), and the Montgomery County Police Department authorizing officers to act as agents of the property owners for purposes of enforcing trespass laws.  The letter outlining the agreement, written from the President of the Homeowners' Association to the Montgomery County Chief of Police, provides:

> On behalf of the North Village Homes Corporation, 10120 Apple Ridge Road, Montgomery Village, Maryland, 20886-1000, all Officers of the Montgomery County Police Department are authorized to act as agents of the Owners pursuant to § 6-403 of the Criminal Law Article.[2] Montgomery County Officers are authorized to notify any person(s) not to remain upon, enter upon, or cross over the aforementioned property, subject to arrest.
>
> This authorization is effective immediately, and will remain in effect until you receive written notification to the contrary from the North Village Homes Corporation or its management agent.  This authorization is limited

---

[2] The statute provides, in pertinent part: (a) A person may not enter or cross over private property . . . of another, after having been notified by the owner or the owner's agent not to do so, unless entering or crossing under a good faith claim of right or ownership; (b) A person may not remain on private property . . . after having been notified by the owner or the owner's agent not to do so; (c) A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 90 days or a fine not exceeding $500 or both; (d) This section prohibits only wanton entry on private property. MD. CRIM. LAW, art. § 6-403 (2002), *amended by* 2006 Md. Laws Ch. 64.

and is for the sole purpose of permitting officers to act pursuant to § 6-403 of the Criminal Law Article. Additionally, this authorization permits Montgomery County Law Enforcement to take appropriate action through undercover operations to eliminate from the community illegal drug activity (dangerous substances).

In the event any major incident occurs during normal business hours requiring response or input from the North Village Homes Corporation, please call the Agent for the North Village Homes Corporation, [ ].  For additional assistance, call Atlantic Security Company at [ ].

(Paper 37, Ex. 4).  According to deposition testimony of Sergeant Brian Stone, who was not present at the incident but supervises officers who patrol that area of Montgomery County, the agency agreement anticipates that Montgomery County police officers will approach a person, request his identification, and determine whether he has a legitimate reason to be on the premises.  If, in the officer's judgment, the individual has an illegitimate reason for being there, the officer may eject him from the property or issue to him a notice banning him from the property for a year. Pursuant to the agreement, both the police department and the private security firm hired by the Homeowners' Association, Atlantic Security, maintain a "ban list," also known as a "trespass log."  The trespass log is a list of people who have been issued trespass notices by the security personnel, property owners or Montgomery County police officers.  An individual who has been banned may appeal the decision to the Board of Directors of the Homeowners' Association.  (Paper 32, Ex. 2, Stone dep. at 22-25)

Shortly after midnight on June 26, 2003, Officer Steve Smugeresky of the Montgomery County Police Department was on routine patrol in a townhouse development in Gaithersburg, Maryland.  Officer Smugeresky was uniformed and driving a marked police cruiser.  He observed eight to ten young people, including Plaintiff, who was 17 years old at the time, standing on a public sidewalk in front of 9321 Chadburn Place.  Plaintiff and the other individuals were "just hanging out, talking."  (Paper 32, Ex. 4, Franklin dep. at 61). Upon observing the eight to ten individuals, Officer Smugeresky radioed for back-up assistance, then parked his police cruiser and approached the group on foot.  Officer Smugeresky recognized one of the individuals, Steve Lee, who was holding and operating a hand held video camera with which he partially recorded the incident at issue in this case.[3]

Officer Smugeresky addressed the entire group in an authoritative tone of voice.  He demanded that the individuals give him their identification, stating: "You have to prove to me that you live in this area" and, in response to an inquiry as to the purpose of his demand, "I don't have to explain it to you.  If I ask for ID, you're supposed to give it to me."  (Paper 37, Ex. 3, Smugeresky dep. at 110; Ex. 7).  Plaintiff promptly handed Officer Smugeresky his Maryland provisional driver's license.  When some

---

[3] The video tape is not an appropriate subject for judicial notice, which is allowed for adjudicative facts pursuant to FED.R.EVID. 201.  Thus, Plaintiff's motion is DENIED.

members of the group refused to hand over their identification, Officer Smugeresky said, "I've been nice so far, do you want me to start getting mean?"  (Paper 37, Ex. 3, Smugeresky dep. at 114; Exhibit 7).  Plaintiff's driver's license showed that he lived at 9437 Chadburn Place, a home in the same housing complex less than a block away.

Approximately four minutes after Officer Smugeresky radioed for back-up assistance, several Montgomery County police officers arrived, including Officers Robert Lumsden, Sandra Moss, and Geoffrey Rand.  Two private security officers, Jack Bowser and Stacy Miller, of Atlantic Security, also appeared.

Officer Smugeresky handed at least two of the confiscated identification cards, including Plaintiff's, to Officer Lumsden and asked him to run warrant checks on them.  Officer Lumsden took the identification cards back to his police cruiser to run the warrant checks, and within two to three minutes he learned that Plaintiff had no outstanding warrants.

As the warrant checks for other members of the group were completed, Officer Smugeresky distributed the identification cards to their respective owners, some of whom began to leave the scene. After completing the warrant check on Plaintiff's driver's license, Officer Lumsden walked back to the group and stood next to Officer Smugeresky, all the while retaining Plaintiff's identification.

Plaintiff repeatedly requested that Officer Lumsden return his driver's license.

At this point an altercation occurred between Plaintiff and the police officers. During the altercation, Officer Lumsden used a Taser on Plaintiff which delivered approximately 50,000 volts of electricity to Plaintiff's back. Officer Smugeresky arrested Plaintiff and charged him with second degree assault. The entire incident, from Officer Smugeresky's initial stop to Plaintiff's arrest, lasted approximately 15 minutes. However, Plaintiff's and Defendants' versions of the facts immediately preceding and throughout the altercation are significantly different. Each party's version of the altercation is presented, *infra*.

## 2. The Disputed Facts

### a. Plaintiff's Version

Once Officer Lumsden ran the warrant check on Plaintiff's driver's license, he learned that Plaintiff had no outstanding warrants. And, although Officer Lumsden returned other people's identifications when their warrant checks cleared, he retained Plaintiff's driver's license. Plaintiff repeatedly requested in a "fairly calm" manner that Officer Lumsden return his driver's license. (Paper 37, Ex. 8, Franklin dep. at 100). Indeed, Plaintiff states that aside from being "slightly annoyed, [he] was never anything other than calm" throughout the incident. (*Id.*)

Plaintiff asked for his driver's license back three to four times. (Paper 32, Ex. 17 at 4).

In response to one of Plaintiff's requests for his driver's license, Officer Lumsden called Plaintiff a "jackass." (Paper 37, Ex. 8, Franklin dep. at 109). Plaintiff then approached Officer Lumsden until he was roughly two and a half feet away and said, "just give me my ID back so I can go home." (*Id.*) Officer Lumsden pushed Plaintiff in the chest with both hands, causing Plaintiff to fall back and wobble. Plaintiff testifies in his deposition:

> "I was probably three, two or three feet from [Officer Lumsden], and I stepped forward and I said, just give me my ID back, and I took like a half a step for that exact reason to stay away from him. I put my hand out and that's when Officer Smugeresky jumped my back."

(Paper 37, Ex. 8, Franklin dep. at 111).

While Officer Smugeresky was attempting to force Plaintiff to the ground, another officer hit or kneed Plaintiff in the groin, causing him to "keel over" so that he landed face down on the ground. (Paper 37, Ex. 8, Franklin dep. at 112).

While Plaintiff was on the ground, the officers attempted to get his arms out from underneath him. Plaintiff tried to cooperate but the combination of his own weight and the weight of Officer Smugeresky pressing down on him prevented him from moving his arms.[4] Within seconds of being on the ground, Officer Lumsden

---

[4] Plaintiff was 6 feet 5 inches tall and weighed 290 pounds. He estimates that his own weight combined with the weight of
(continued...)

used his Taser on Plaintiff.  Plaintiff states that he received no warning that Officer Lumsden was about to use his Taser.

### 3. Defendants' Version

While Plaintiff's identification was in Officer Lumsden's possession and after the warrant check had been completed, Plaintiff became "increasingly agitated" and "very irate." (Defendants' Memorandum at 5; Paper 32, Ex. 5, Lumsden dep. at 39). Plaintiff paced back and forth, occasionally clenched his fists and made various pointing gestures at the officers.  (Paper 37, Ex. 5, Smugeresky dep. at 53-54).  "Suddenly, Mr. Franklin's anger and hostility escalated . . . he began pacing back and forth and seemed jittery."  Officer Smugeresky testifies in his deposition that Plaintiff yelled, "Give me my ID back, give me my [expletive] ID back." (Paper 32, Ex. 1, Smugeresky dep. at 36).  Plaintiff lunged toward Officer Lumsden with a pointed finger and got within a foot of him.  Officer Lumsden pushed Plaintiff away.  Plaintiff then stepped in the direction of Officer Lumsden a second time with his arm raised.  At this point Officer Smugeresky tackled Plaintiff from behind and forced him to the ground.  At least three officers attempted to handcuff him.  Plaintiff resisted their attempts by keeping his hands and arms beneath his chest, with both arms flexed, and kicking his legs.  Repeated commands were given

---

[4](...continued)
Officer Smugeresky, who was kneeling on his back, was between 500 and 600 pounds. (Paper 37, Ex. 8, Franklin dep. at 113).

directing Plaintiff to stop resisting, but he refused to comply. Officer Lumsden told Plaintiff that if he did not place his hands behind his back, Officer Lumsden would use his Taser.  Then Officer Lumsden deployed his Taser into Plaintiff's back, using the air cartridge.   Immediately after the deployment of the Taser, Plaintiff placed his arms behind his back and he was handcuffed.

## B.  Procedural Background

Plaintiff Edwin M. Franklin was charged in Juvenile Court with second degree assault and found "Not Involved" on November 20, 2003.  On February 18, 2005, Plaintiff filed a civil action against Defendants Montgomery County, Maryland, Montgomery County Police Chief J. Thomas Manger, in his official capacity, and Montgomery County Police Officers Steve Smugeresky, Robert T. Lumsden, and Sandra Moss, all individually and in their official capacities. (Paper 1; paper 38).   On October 21, 2005, the court granted Plaintiff's motion to dismiss the claims against Defendant Sandra Moss.

Plaintiff asserts violations of his federal and state constitutional rights, as well as various state common law tort claims.[5]  Mr. Franklin alleges the following counts: (1) Count I, false arrest, against all Defendants; (2) Count II, false

---

[5]    Plaintiff's complaint does not specify a particular defendant for most of the claims.  In his opposition to Defendants' motion for summary judgment and cross-motion for summary judgment, however, Plaintiff summarizes the counts in the manner listed here. (Paper 38).

imprisonment, against all Defendants; (3) Count III, battery, against Officer Smugeresky; (4) Count IV, battery, against Detective Lumsden; (5) Count VI, malicious prosecution, against Officers Smugeresky and Lumsden; (6) Count VII, violations under 42 U.S.C. § 1983 of his federal civil rights for unreasonable search and seizure, against Officers Smugeresky and Lumsden; (7) Count VIII, violations under 42 U.S.C. § 1983 of his federal civil rights for an unconstitutional policy, against Montgomery County; (8) Count IX, violations under 42 U.S.C. § 1983 of his federal civil rights for failure to train, against Montgomery County; and (9) Count X, violations of Articles 24 and 26 of the Maryland Declaration of Rights, against Officers Smugeresky and Lumsden.[6] (Paper 38).

On January 19, 2006, Defendants filed a motion for summary judgment on all claims.  (Paper 32).  On February 17, 2006, Plaintiff filed an opposition to Defendants' motion for summary judgment and a cross-motion for summary judgment. (Paper 38).

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* FED.R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

---

[6]  Count V is a battery claim against Officer Moss, who was dismissed from this lawsuit.

(1986).   In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1987).   The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* FED.R.CIV.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).   A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.   Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256;

*Celotex Corp.*, 477 U.S. at 324.   However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).   There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

The inquiry involved on a summary judgment motion "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson*, 477 U.S. at 252. Where the movant also bears the burden of proof on the claims at trial, it "must do more than put the issue into genuine doubt; indeed, [it] must remove genuine doubt from the issue altogether." *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999) (internal quotation omitted), *cert. denied*, 530 U.S. 1204 (2000); *see also Proctor v. Prince George's Hosp. Ctr.*, 32 F.Supp.2d 820, 822 (D.Md. 1998) (evidentiary showing by movant "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party") (internal quotation and italics omitted).   Summary judgment will not be appropriate unless the movant's evidence supporting the motion "demonstrate[s] an absence of a genuine dispute as to every fact material to each element of

the movant's claim and the non-movant's response fails to raise a genuine issue of material fact as to any one element." *McIntyre v. Robinson*, 126 F.Supp.2d 394, 400 (D.Md. 2000) (internal citations omitted).

When faced with cross-motions for summary judgment, as in this case, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). *See also havePower, LLC v. Gen. Electric Co.,* 256 F.Supp.2d 402, 406 (D.Md. 2003) (citing 10A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2720 (3d ed. 1983)). The court reviews each motion under the familiar standard for summary judgment, *supra*. The court must deny both motions if it finds there is a genuine issue of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A FEDERAL PRACTICE & PROCEDURE § 2720.

## III. Analysis

### A.   Federal Constitutional Claims Against the Officers in Their Personal Capacities (Count VII)

Plaintiff alleges that Officers Smugeresky and Lumsden violated his Fourth Amendment right to be free from unreasonable searches and seizures. A "court must look to the substance of the complaint, the relief sought, and the course of proceedings to determine the nature of the plaintiff's claims." *Briggs v.*

*Meadows*, 66 F.3d 56, 58 (4th Cir. 1995).   Plaintiff does not specify, in the section of the complaint specific to this count, which acts of each officer he challenges.   Rather, he states only that "Defendants' actions" violated his Fourth Amendment rights (paper 1).   Nevertheless, based on the facts alleged, it is possible that he alleges that the initial encounter, retention of his driver's license, and tackling and use of the Taser on him constitute potential violations of his rights.

### 1. Initial Encounter with Officer Smugeresky

Plaintiff states in his complaint that "[w]ithout reason to believe that Plaintiff had committed or was committing any crime, Defendant Officer Smugeresky approached Plaintiff and his friends and demanded that they give him identification" in violation of the Fourth Amendment.   (Paper 1).   The Fourth Amendment, in pertinent part, provides individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."   U.S. CONST. amend. IV.   An individual is seized within the meaning of the Fourth Amendment when that person yields to any official "show of authority" that a reasonable person would interpret as a command to restrict his or her movement. *California v. Hodari D.*, 499 U.S. 621, 628 (1991).

Defendants argue that they are entitled to summary judgment on this claim because the "identification check did not constitute a seizure of [Plaintiff's] person for purposes of the Fourth

Amendment." (Paper 32).  Defendants rely on case law holding that officers may ask for and take identification without implicating the Fourth Amendment.

Officer Smugeresky testified that he approached Plaintiff because he did not recognize him.  He requested Plaintiff's identification to determine if he was banned from the area or had any outstanding warrants.  (Paper 32, Ex. 1, Smugeresky dep. at 23-24).

> The Supreme Court has recognized three distinct types of police-citizen interactions: (1) arrest, which must be supported by probable cause, *see Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); (2) brief investigatory stops, which must be supported by reasonable articulable suspicion, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and (3) brief encounters between police and citizens, which require no objective justification, *see Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389, (1991).

*United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002).  When an officer merely approaches a person and requests identification, like Officer Smugeresky in this case, his action falls under the latter category and does not implicate the Fourth Amendment.  *Id*.

Plaintiff argues that the approach and request for his identification were unconstitutional because Officer Smugeresky acted with the purpose of enforcing the Homeowners' Association's trespass law.  There is no controlling precedent on whether an agency agreement between private property management and the local

police department is constitutionally valid.  The sole District of Maryland case to touch on this issue, *Diggs v. Hous. Auth. of the City of Frederick,* 67 F.Supp.2d 522 (D.Md. 1999), merely implies that such agreements are valid, and its usefulness here is limited at best.  In *Diggs*, the Housing Authority of the City of Frederick authorized the Frederick City Police Department to act as its agent to enforce trespass laws on its numerous properties.  The court does not raise, much less decide, the issue of whether the agency agreement between the Housing Authority and the police department is valid.  In weighing the potential harm defendants would suffer if the court granted a preliminary injunction, the court notes that "enforcement of the current trespass policy is . . . [a] drug- and crime-fighting measure available to local authorities." *Id.* at 533.  By including the agency agreement in its balancing test, the court implies that it is a valid arrangement.

The Court of Appeals of Virginia approved a process by which Leesburg police officers were designated as agents of a public housing project to serve barment (trespass) notices on people trespassing on public housing property. *Holland v. Commonwealth,* 28 Va.App. 67 (1998); *Collins v. Commonwealth*, 30 Va.App. 443 (1999).  The agreement "allowed police to identify and remove individuals who were on the property without legitimate purpose . . . ." *Holland*, 28 Va.App. at 73.  The court reasoned that the power of the police to respond to requests for assistance from

16

private citizens was necessarily implied by the state statute detailing the powers and duties of the police force. *Id.* at 75. The court characterized the property manager's designation of the police officers as her agents as "an ongoing request for assistance" from a private citizen. Enforcing trespass law pursuant to the agreement was therefore within the police officers' powers and duties. *Collins*, 30 Va.App. at 449 (citing *Holland*, 28 Va.App. at 75-76).

There are two obvious distinctions between *Holland* and the instant case. First, *Holland* rests on interpretation of a Virginia statute that is not applicable here. Second, the property in *Holland* is a public housing complex, whereas here the property is privately owned. State ownership of the property could arguably provide a basis for police acting as agents of the property management that would be absent in the context of privately-owned property. The Court of Appeals of Maryland dispelled this notion and held that public housing project managers "act in the same manner as the management of privately-owned apartment complexes . . . and do not operate the premises as public buildings or as public agencies." *Johnson v. State*, 356 Md. 498, 510 (1999). The *Johnson* court, however, specifically declined to rule on the authority of the Annapolis City police to act as the agent of the Housing Authority in that case. *Id.* at 506.

Cases from Illinois and Washington approve similar agency agreements between property owners and police departments, but set limits on the scope of police officers' authority to stop individuals. *See People v. Thompson*, 337 Ill.App.3d 849 (2003) (holding that agreement between Hispanic Housing Authority and Danville police department authorized Danville police officers to stop and identify unknown persons on the property but could not "be the basis for forming a reasonable articulable suspicion of criminal activity"); *People v. Beverly*, 364 Ill.App.3d 361 (2006) (holding that agency agreement between privately owned apartment complex and Aurora police department to enforce trespass law authorized police officers to approach an individual but did not provide basis for reasonable suspicion justifying a seizure of that individual); *State v. Blair*, 65 Wash.App. 64 (1992) (holding that police officer who had "admonished" defendant not to return to public housing complex, pursuant to agency agreement between complex and Seattle Police Department, did not have probable cause to arrest defendant when he returned to premises).

Each agreement, including the one at issue here, authorized agent police officers (1) to approach a person to request identification and (2) to determine whether a person is legitimately present on the property. All police officers are entitled to perform the first prong. *See, e.g.*, *Weaver*, 282 F.3d at 309 (stating that it is "axiomatic that police may approach an

individual on a public street and ask questions without implicating the Fourth Amendment's protections"). Thus, the only limited, additional authority each agency agreement confers on agent police officers is the power to determine whether someone is legitimately on the property, and if not, to give him notice that he is trespassing. In this case, however, the added authority, to order a person off the property, was not invoked. Thus, even if there were some constitutional infirmity in the agreement, it is not implicated here.

Defendants' motion for summary judgment on Count VII with respect to the initial encounter with Officer Smugeresky will be granted, and Plaintiff's cross-motion for summary judgment will be denied.

### 2. Retention of Plaintiff's Driver's License by Officer Lumsden

The initial interaction between Plaintiff and Officer Smugeresky was a consensual encounter. What starts as a consensual encounter between police and citizen becomes a seizure within the meaning of the Fourth Amendment only when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Analla*, 975 F.2d 119, 124 (4th Cir. 1992) (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984), *remanded sub nom. to Int'l Ladies' Garment Workers' Union, AFL-CIO v. Sureck*, 736 F.2d 1340 (9th Cir. 1984)). In the specific instance of deciding whether a request for

a person's driver's license constitutes a seizure, the United States Court of Appeals for the Fourth Circuit considers the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statements to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer, and the physical touching by the police of the citizen. *Weaver*, 282 F.3d at 310.  Here, the question is whether, under the totality of the circumstances, what started as a consensual encounter between the police and Plaintiff became a seizure within the meaning of the Fourth Amendment.  If this was a Fourth Amendment seizure, then Defendants needed reasonable suspicion to detain Plaintiff.

Several United States courts of appeals have adopted *per se* rules that retention of one's driver's license beyond the time it takes reasonably to review it is a nearly dispositive factor that a seizure has occurred.  *See, e.g., United States v. Jordan*, 958 F.2d 1085, 1086 (D.C. Cir. 1992) ("once the . . . [police] have had a reasonable opportunity to review it, if the identification is not returned to the detainee [it is] difficult to imagine that any reasonable person would feel free to leave without it").

Unlike some of its sister circuits, the Fourth Circuit has "expressly refuse[d] to adopt a bright line rule that when an officer retains an individual's identification beyond its intended

purpose . . . the individual whose identification is retained is effectively seized for purposes of the Fourth Amendment." *Weaver*, 282 F.3d at 310.  The significance of retaining an individual's identification should be measured by whether it is necessary to the person's "continuing onward."  *Id*. at 312.  For instance, in the context of a routine traffic stop, the retention of one's driver's license is a seizure because it is illegal to drive without a license in one's possession.  *Id*. at 311.  Pedestrian encounters on the other hand, are much less restrictive of a person's movements than traffic stops because a "driver's license [is] not necessary to [continue] onward."  *Id*. at 312.  A pedestrian is free to walk away from an encounter, even if doing so would create "an awkward situation" between the pedestrian and the police officer.  *Id*. at 311.

Plaintiff properly distinguishes *Weaver* from the instant case by noting one crucial, factual difference: defendant Weaver never requested that his driver's license be returned.  *Id*. at 312.  In *Weaver*, an officer approached the defendant, whom he believed matched the description of a suspect wanted for a string of bank robberies, and asked to speak with him.  Defendant voluntarily handed his driver's license to the officer, who ran a warrant check on it.  After determining that there were no warrants for defendant's arrest, but before returning his driver's license, the officer asked defendant if he would accompany him to a nearby bank,

defendant agreed.   The officer accidentally took defendant to the
wrong bank and asked defendant to accompany him to a second bank,
defendant agreed once more.   At the second bank, defendant was
identified by a teller as the person depicted in the wanted poster
and was arrested. *Weaver*, 282 F.3d at 307.

Weaver argued that the encounter between himself and the
officer was not consensual because the officer had retained his
driver's license.   The trial court held that defendant "was in no
way impeded physically by holding his [identification] from him,
and that because [he] did not ask for his driver's license back, he
was not in that sense detained." *Id.* at 309 (internal quotations
omitted).   The Court of Appeals reviewed all legal conclusions *de
novo* and determined that under the totality of the circumstances,
the encounter between defendant and the officer was consensual and
therefore did not implicate the Fourth Amendment. *Id.* at 313.   In
its balancing test the court notes, "Weaver was free . . . to
request that his license be returned to him so that he could end
the encounter." *Id.* at 312; *see also Analla*, 975 F.2d at 124
("Analla was free at this point to request that his license and
registration be returned and to leave the scene").   Here, Plaintiff
contends that he attempted to end the encounter by requesting three
or four times that Officer Lumsden return his driver's license.

Under the factors outlined in *Weaver*, if the facts as alleged
by Plaintiff are true, a reasonable person in Plaintiff's position

would not have felt free to leave, transforming what had been a consensual encounter into a Fourth Amendment seizure.  As to the "time, place, and purpose" factor, Officer Smugeresky states that he requested Plaintiff's driver's license to check to see if Plaintiff had any outstanding warrants or was trespassing.  Once Officer Lumsden learned that Plaintiff had no warrants and was not trespassing, that purpose was met, yet Officer Lumsden did not return Plaintiff's driver's license.  Thus, the purpose of the detention was unclear.  Plaintiff could reasonably have thought that because Officer Lumsden refused his three to four requests for the return of his driver's license, the officers had some other purpose for detaining him and he was not free to leave.  In addition, Officer Lumsden returned the driver's licenses of other people on the scene, but retained Plaintiff's.  The fact that Officer Lumsden treated Plaintiff differently than everyone else also suggests that he had some other purpose for detaining Plaintiff, and that this was a seizure.

As to the "words used by the officer," Officer Lumsden called Plaintiff a "jackass" and told him to "shut up" in response to his requests.  The officer's hostile remarks and refusal to turn over Plaintiff's driver's license indicate that Plaintiff was not free to leave.

The authoritative tone of voice used by the officers, combined with Officer Smugeresky's previous threat that he would "start getting mean" if people did not obey his orders also suggest that

Plaintiff was not free to leave.  Finally, the presence of four armed police officers and two security guards is threatening and weigh in favor of finding that this was a seizure.

Thus, there is a question of fact whether under the totality of the circumstances a reasonable person would have felt free to leave.  If the facts are as Plaintiff contends, there is evidence that the initial consensual encounter was transformed into a Fourth Amendment seizure.

If the encounter was indeed transformed into a seizure, then Defendants needed reasonable suspicion that a crime had been or was about to be committed to detain Plaintiff.  "A police officer may elevate a police-citizen encounter into an investigatory detention only if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause."  *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000).  Although "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  In other words, something more than an unparticularized suspicion or hunch is required.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989), *remanded to* 876 F.2d 786 (9th Cir. 1989).

Here, Officer Smugeresky stopped Plaintiff and his friends because he "wasn't familiar with them and [he] wanted to  make sure they belonged in the area." (Paper 37, Ex. 3, Smugeresky dep. at 93).  Officer Smugeresky stated that he approached the individuals because they were "doing things that they should not be doing," namely sitting or leaning on vehicles that did not belong to them. (Paper 37, Ex. 3, Smugeresky dep. at 93).  Officer Smugeresky admitted that leaning on someone else's car is not a crime and that the police had not received any complaints about Plaintiff or his friends from either residents or the owners of the vehicles on the night in question.  (Paper 37, Ex. 3, Smugeresky dep. at 93-94). Although reasonable suspicion does not affect the constitutionality of the initial approach, it does determine the constitutionality of the detention, and by his own words, Officer Smugeresky did not have a reasonable suspicion that Plaintiff had committed or was about to commit any crime.  Officer Lumsden testified that the only reason he retained Plaintiff's driver's license was because he "wasn't sure if Officer Smugeresky was done with [Plaintiff] yet or not." (Paper 37, Ex. 2, Lumsden dep. at 40).  Defendants have come forward with no evidence that there was reasonable suspicion of criminal activity, thus the seizure would be unconstitutional.

Defendants argue that even assuming there were Fourth Amendment violations, the doctrine of qualified immunity shields Defendants from personal liability.  Entitlement to qualified immunity must be analyzed in two steps, which are to be "considered

in proper sequence." *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *remanded sub nom. to Katz v. United States*, 262 F.3d 897 (9th Cir. 2001); *see also Jones v. Buchanan*, 325 F.3d 520, 526-27 (4th Cir. 2003). The court first must resolve the issue of whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. If the evidence establishes a violation of a constitutional right, "[t]he next, sequential step is to ask whether the right was clearly established" at the time of the events at issue. *Id.* If the answer is no, that is, that a right is not "clearly established," the qualified immunity doctrine shields a defendant officer from liability from suit. The court should make a ruling on the qualified immunity issue "early in the proceedings so that the cost and expenses of trial are avoided where the defense is dispositive." *Saucier*, 533 U.S. at 200.

When qualified immunity is raised as a defense, the plaintiff must produce evidence that the defendants' actions violated clearly established law. *See, e.g., Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) ("The defendant bears the initial burden of coming forward with facts to suggest that he acted within the scope of his discretionary authority during the incident in question. Thereafter, the burden shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established

that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct."); *Pierce v. Smith*, 117 F.3d 866, 871 (5th Cir. 1997) (where § 1983 defendant pleads qualified immunity and shows he is a government official whose position involves the exercise of discretion, plaintiff has the burden to rebut qualified immunity defense by establishing the violation of clearly established law); *Magdziak v. Byrd*, 96 F.3d 1045, 1047 (7th Cir. 1996); *Dixon v. Richer*, 922 F.2d 1456, 1460 (10th Cir. 1991). *See also S.P. v. City of Takoma Park, Md.,* 134 F.3d 260, 265 (4th Cir. 1998)(affirming a district court's dismissal based on qualified immunity because the plaintiff "failed to allege facts demonstrating the violation of clearly established law"); *Jenkins v. Medford*, 119 F.3d 1156, 1160 (4th Cir. 1997) ("When reviewing a claim of qualified immunity, we consider whether the plaintiff has been deprived of a constitutional right.  If the complaint shows that the plaintiff has not suffered such a deprivation, the defendant is entitled to dismissal of the claim under Rule 12(b)(6).").

A right is clearly established "when 'its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006). (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), *remanded to* 304 F.3d 1331 (11th Cir. 2002)).  The exact action in question need not

have been held to be unlawful "because 'general statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'" *Ridpath*, 447 F.3d at 313 (quoting *Anderson v. Creighton*, 483 U.S. 635, 741 (1987); *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (2004), *cert. denied*, 543 U.S. 1050 (2005). The court therefore must consider "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." *Owens*, 372 F.3d at 279 (quoting *Amaechi v. West*, 237 F.3d 356, 362–63 (4th Cir. 2001)). The key issue is whether the law, when the events in question occurred, "gave the officials 'fair warning' that their conduct was unconstitutional." *Ridpath*, 447 F.3d at 313.

Plaintiff has not identified clear precedent, binding on these officers, that the retention of a pedestrian's driver's license after he requests its return converts an otherwise consensual encounter to a stop requiring reasonable suspicion. Indeed, the only Fourth Circuit precedent, *Weaver*, states that when a pedestrian is involved, the retention of his driver's license is *not*, by itself, a seizure. 282 F.3d at 313. The holding of *Weaver* did not give the officers "fair warning" that their conduct was unconstitutional. It is Plaintiff's burden to come forward with

citation to clearly established authority that the officers acted unconstitutionally and he has not done so.  Accordingly, Defendants are entitled to qualified immunity on this aspect of the case.

### 3.  Use of Excessive Force by Both Defendants[7]

The Fourth Amendment's freedom from unreasonable searches and seizures unquestionably encompasses the right to be free of excessive force during an arrest. *See Jones*, 325 F.3d at 527.  This right is violated when an arresting officer's actions are not "objectively reasonable in light of the facts and circumstances confronting [him]." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The reasonableness of an officer's conduct must be assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.  Thus, the determination of whether the force used during the course of an arrest was reasonable is extremely fact dependent.  The application of the Fourth Amendment reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others,

---

[7] If the continued detention of Plaintiff violated the constitution, the use of any force would be unreasonable.  On the other hand, even if the continued encounter with Plaintiff did not itself violate the constitution, Plaintiff enjoyed the right not to be subjected to excessive force when he was arrested.

and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.; see also Jones*, 325 F.3d at 527.

Central to the question of whether Defendants' actions were reasonable under the circumstances is the nature of Plaintiff's behavior immediately preceding Officer Smugeresky's tackle and Officer Lumsden's use of the Taser on Plaintiff. The two sides offer conflicting evidence of the event. Plaintiff testified that he was standing two to three feet away from Officer Lumsden when he stepped forward, put his hand out, and said, "just give me my ID back." Then, for apparently no reason, both Officers attacked him, put him on the ground and within seconds used a Taser on him. (Paper 37, Ex. 8, Franklin dep. at 108-111).

Defendants testified that Plaintiff became increasingly agitated and made threatening gestures such as clenching and unclenching his fists, cursing and pacing. (Paper 37, Ex. 5, Smugeresky dep. at 53-54). They stated that Plaintiff lunged at Officer Lumsden, who responded by pushing him away. Plaintiff again advanced toward the officer, with his arm raised. Defendants testified that the officers believed Plaintiff was about to assault Officer Lumsden and that is why they forced him to the ground. (Paper 32, Ex. 1, Smugeresky dep. at 43). Furthermore, Defendants asserted that they delayed using the Taser on Plaintiff and only did so because he was physically resisting arrest by keeping his hands beneath him and failing to obey the officers' orders to

cooperate.  (Paper 37, Ex. 2, Lumsden dep. at 71).  Accordingly, there is a factual dispute over the events preceding the tackle and use of the Taser on Plaintiff, which materially affects the determination of whether the force used by the officers was reasonable.

If a fact-finder determines that Defendants violated Plaintiff's Fourth Amendment rights, Defendants would not be entitled to qualified immunity on the excessive force part of the case.  A plaintiff's right to be free from excessive force during an arrest is a clearly established right of which the officers surely were aware.  *See Jones*, 325 F.3d at 527.  If the officers used unreasonable force, then they violated Plaintiff's clearly established right, precluding the qualified immunity defense.

Because a question of fact exists as to whether the amount of force used by the officers was reasonable, summary judgment on this issue will be denied to both parties.

## B.   Federal Constitutional Claims Against Montgomery County and the Officers in Their Official Capacities

In Count VII, Plaintiff asserts federal civil rights violations against Officers Smugeresky and Lumsden in their official and individual capacities.  In Counts VIII and IX Plaintiff asserts federal civil rights violations against Montgomery County itself.

A claim against a public official in his or her official capacity is simply one way of asserting a claim against the governmental unit of which the official is a part:

> Suits against local government officials in their official capacities "represent only another way of pleading an action against an entity of which an officer is an agent . . . ." *Monell v. Dept. of Soc. Serv. of City of N.Y.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611, 635 n. 55 (1978). Consequently, "the real party in interest in an official-capacity suit is the governmental entity and not the named official . . . ." *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301, 309 (1991). *See also Ritchie v. Donnelly, supra,* 324 Md. [344] at 358-359, 597 A.2d [432] at 439 [(1991)].

*Ashton v. Brown*, 339 Md. 70, 111 (1995).  Stated otherwise:

> While "[p]ersonal capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law," official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent" and in essence are "suit[s] against the entity." *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)(internal quotation marks omitted).

*Andrews v. Daw*, 201 F.3d 521, 525 (4th Cir. 2000).

Plaintiff has not suggested any rationale for maintaining both methods of bringing claims against Montgomery County.  Accordingly, summary judgment as to Count VII against Officers Smugeresky and Lumsden, in their official capacities only, will be granted to Defendants, and denied to Plaintiff.

Plaintiff asserts § 1983 *Monell* claims against Montgomery County for an unconstitutional policy that makes police officers agents of the Homeowners' Association (Count VIII) and failing to train and supervise its police officers properly (Count IX). *See Monell*, 436 U.S. 658. A plaintiff seeking to impose liability pursuant to § 1983 must "adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994); *see also Semple v. City of Moundsville,* 195 F.3d 708 (4th Cir. 1999). The Fourth Circuit has explained that:

> [A] policy or custom may be found in edicts of the city's formal decisionmaking body or in "persistent . . . practices of [municipal] officials" having the *de facto* force of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-68, 90 S.Ct. 1598, 1613-1614, 26 L.Ed.2d 142 (1970); *Languirand v. Hayden,* 717 F.2d 220, 222 (5th Cir. 1983). In addition, such a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, *see Wellington v. Daniels,* 717 F.2d 932 (4th Cir. 1983) (police brutality), or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state. *See Avery v. County of Burke,* 660 F.2d 111 (4th Cir. 1981) (sterilization of women with sickle cell condition). In corollary to these principles, it follows that a municipal policy or custom giving rise to § 1983 liability will not be inferred merely from municipal inaction in the face of isolated

> constitutional deprivations by municipal employees. *See, e.g., Rizzo v. Goode,* 423 U.S. 362, 375, 96 S.Ct. 598, 606, 46 L.Ed.2d 561 (1976) (no municipal liability where incidents did not exceed statistical norm for comparable municipalities); *Wellington v. Daniels* (no municipal liability in absence of widespread police brutality).

*Milligan v. City of Newport News*, 743 F.2d 227, 229-230 (4th Cir. 1984).

Montgomery County argues that it is entitled to summary judgment on Plaintiff's § 1983 claims because he has failed to provide any factual basis to support imposition of municipal liability. In a long and well-settled line of cases, the Supreme Court has made clear that a municipality, such as Montgomery County, "can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue" through a municipal policy or custom. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original). Indeed, the Court has "consistently refused to hold municipalities liable under a theory of *respondeat superior*." *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403 (1997). Under *Monell* and its progeny, "municipal liability results only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury.'" *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987), *cert. denied sub nom. City of Fayetteville, N.C. v. Spell*, 484 U.S. 1027 (1988)

(quoting *Monell*, 436 U.S. at 694).  Thus, "[§] 1983 plaintiffs seeking to impose liability on a municipality must, therefore, adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan*, 15 F.3d at 338.

Plaintiff claims that Montgomery County's agreement with the Homeowners' Association was an unconstitutional policy (Count VIII) and that Montgomery County failed to train and instruct its police officers properly (Count IX).

## 1.  Unconstitutional Policy (Count VIII)

Plaintiff asserts in his complaint that pursuant to its agreement with the Homeowners' Association, Montgomery County instructed its police officers to exceed the limits of the Fourth Amendment, resulting in a policy or custom that proximately caused his injuries.

The threshold issue in any *Monell* claim is whether a constitutional violation occurred.  *See City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (stating that the court cannot award damages against a municipal corporation based on the actions of one of its officers if the officer inflicted no constitutional harm).  Plaintiff fails to establish as a matter of law that the activity authorized by the agreement between Montgomery County police officers and the Homeowners' Association is unconstitutional

or that any such authorization played a role in his eventual arrest. Accordingly, Defendants' motion for summary judgment as to Count VIII will be granted, and Plaintiff's cross-motion for summary judgment will be denied.

**2. Improper Training (Count IX)**

Plaintiff contends that Montgomery County's supervisory police officers "tolerated and ratified the illegal conduct" of the officers because they knew or should have known that Officers Smugeresky and Lumsden illegally detained and arrested Plaintiff. (Paper 1). Furthermore, asserts Plaintiff, Montgomery County's "failure to train, instruct, supervise and discipline its police officers constitutes a custom or pattern which resulted in the violation" of Plaintiff's federal and state Constitutional rights. (*Id.*)

Since *Monell*, the Supreme Court has held that the "inadequacy of police training may serve as the basis for § 1983 liability [, but] only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio,* 489 U.S. at 388; *see also Spell,* 824 F.2d at 1389-90. Plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of County Comm'rs of Bryan County, Okla.*, 520 U.S. at 404; *see also City of Newport News*, 743 F.2d at 230 ("[E]ven where such a 'policy' of municipal inaction

might be inferred, it must still be shown to have been the 'moving force of the constitutional violation' specifically charged in order to create municipal liability."). For example, in *City of Springfield, Mass. v. Kibbe*, 480 U.S. 257, 268-69 (1987), alleged omissions in municipal training were held to be insufficient to constitute a § 1983 claim where there were other factors "that were equally likely to contribute or play a predominant part in bringing about the constitutional injury: the disposition of the officers, the extent of their experience with similar incidents, [and] the actions of the other officers involved," and where there was insufficient evidence that the "municipality's inadequate training 'caused' the plaintiff's injury."

Not only did Plaintiff fail to discount any potential intervening causes of the incident, but he also failed to allege *any* facts regarding Montgomery County's policies, customs, training, or lack thereof that could have "caused" or been the "moving force" behind the alleged deprivation of Plaintiff's constitutional rights.

The only evidence Plaintiff offers regarding the nature of Montgomery County's police training is deposition testimony from Officer Smugeresky. (Paper 37, Ex. 3, Smugeresky dep. at 85-87). The officer's testimony is vague and merely states that an Assistant State's Attorney came to the station and gave the officers a brief training related to the agreement between the

police and the Homeowners' Association. (*Id.*) Officer Smugeresky could not recall what the training instructed him to do if someone refused to talk to him, refused to hand over her identification, or whether his authority as an agent of the Homeowners' Association was limited in any way. (*Id.*) Therefore, it is impossible to draw any legal conclusions as to the adequacy of such training based on the evidence proffered by Plaintiff.

Because Plaintiff does not offer specific evidence of the nature of Montgomery County's police training, no genuine issue as to any material fact exists. Accordingly, summary judgment as to Count IX will be granted to Defendants and denied to Plaintiff.

### C. State Constitutional Claims (Count X)

Plaintiff alleges in his complaint that Officers Smugeresky and Lumsden violated his right to be free from unreasonable searches and seizures under Articles 24 and 26 of the Maryland Declaration of Rights. Plaintiff bases his claims on the same factual allegations he uses to support his § 1983 Fourth Amendment search and seizure claims. In their motion for summary judgment Defendants adopt and incorporate the arguments made with regard to the federal Fourth Amendment claims.

Article 24 protects substantive due process rights and Article 26 protects the right to be free from unreasonable searches and seizures; the statutes are construed *in pari materia* with the Fourteenth and Fourth Amendments of the United States Constitution,

respectively.  *See Canaj, Inc. v. Baker and Div. Phase III*, 391 Md. 374, 424 (2006); *see also Carter v. State*, 367 Md. 447, 458 (2002); *see also State v. Smith*, 305 Md. 489, 513-514 (1986).

As in federal law, Maryland follows the principle of statutory construction that "a specific statutory provision governs over a general one." *See Lumbermen's Mut. Cas. Co. v. Insurance Com'r.*, 302 Md. 248, 268 (1982).  Where one statutory provision specifically addresses a matter, and another more general statutory provision also may cover the same matter, "the specific statutory provision is held to be applicable and the general provision is deemed inapplicable." *Id.*  The Supreme Court held that because the Fourth Amendment provides an explicit textual source of constitutional protection against unreasonable searches and seizures, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide" for analyzing conduct that could potentially fall under either category. *Graham*, 490 U.S. at 395.  The court, therefore, will consider Plaintiff's alleged injury solely under the more specific text of Article 26:

> That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

MD CONST. art. XXVI.  Maryland courts "accord great respect and deference to the decisions of the United States Supreme Court in

interpreting the [Fourth] [A]mendment" when construing Article 26. *Carter*, 367 Md. at 458; *see also Muse v. State*, 146 Md.App. 395, 402 n.7 (2002) ("Constructions of the federal amendment by the United States Supreme Court are controlling authority").

The same facts that supported Plaintiff's § 1983 unreasonable search and seizure claims under the Fourth Amendment apply with equal force to Plaintiff's corresponding state claims under Article 26. *See Solis v. Prince George's County*, 153 F.Supp.2d 793, 803 (D.Md. 2001). The Maryland Declaration of Rights differs from § 1983 in one important respect, public officials have no immunity from civil liability for violations of an individual's state constitutional rights. *Ashton*, 339 Md. at 101.

Officer Smugeresky is again entitled to summary judgment because Plaintiff has not shown as a matter of law that Officer Smugeresky exceeded the bounds of the Fourth Amendment, and by extension the bounds of Article 26, by approaching Plaintiff and requesting his identification. It is established that police officers may approach an individual and ask for identification without violating the Fourth Amendment. No case law suggests that doing so for the purpose of enforcing trespass law as an agent of property management is unconstitutional. Therefore, Defendants' motion for summary judgment regarding whether the initial encounter violated the Maryland constitution will be granted.

The substantive analysis underlying resolution of the § 1983 Fourth Amendment claim regarding Officer Lumsden's retention of

Plaintiff's driver's license applies to Plaintiff's Article 26 claim.  A question of material fact exists as to whether Officer Lumsden's retention of Plaintiff's driver's license, despite Plaintiff's repeated requests for its return, violated Plaintiff's federal constitutional rights.  Accordingly, a question of material fact exists as to whether it violated Plaintiff's state constitutional rights.  Because Officer Lumsden does not receive the benefit of qualified immunity for violations of a person's state constitutional rights, Defendants' motion for summary judgment as to whether Officer Lumsden's retention of Plaintiff's driver's license violated Article 26 will be denied.

It has already been established that disputed issues of material fact exist as to Plaintiff's Fourth Amendment excessive force claim, rendering summary judgment on that claim inappropriate.  The court finds no distinctions between Plaintiff's Article 26 and his Fourth Amendment claims, accordingly, Defendants' motion for summary judgment on Plaintiff's excessive force claim under Article 26 will be denied.

**D. State Tort Claims**

**1. False Arrest and False Imprisonment (Counts I and II)**

Count I is a claim against each Defendant for false arrest based on Officer Smugeresky's "illegal stop, detention and arrest" of Plaintiff and Officer Lumsden's illegal detention of Plaintiff.  Count II is a claim against each Defendant for false imprisonment, contending that the officers illegally detained him.

41

Under Maryland law, the necessary elements of false arrest and false imprisonment claims are the same: "1) the deprivation of the liberty of another; 2) without consent; and 3) without legal justification." *Heron v. Strader*, 361 Md. 258, 264 (2000); *see also DeVentura v. Keith*, 169 F.Supp.2d 390, 398 (D.Md. 2001). The interrelationship between false arrest and false imprisonment is such that the "legal justification" to detain element is the "equivalent to legal authority" under the law of arrest. *Dett v. State,* 161 Md.App. 429, 441, *aff'd* 391 Md. 81 (2005). "With regard to an arrest by a police officer, the officer's liability 'will ordinarily depend upon whether or not the officer acted within his legal authority to arrest.'" *Green v. Brooks*, 125 Md.App. 349, 366 (1999) (quoting *Montgomery Ward v. Wilson*, 339 Md. 701, 721 (1995)).

An officer has legal authority to arrest a suspect if the officer was present or in view when the suspect attempted to commit a felony or misdemeanor. *See* MD. CODE ANN., CRIM. PROC. § 2-202 (2002). A warrantless arrest of an individual in a public place for a felony or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause. *United States v. Watson*, 423 U.S. 411, 424 (1976); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (stating that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense

in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

Probable cause is determined from the totality of the circumstances known to the officer at the time of the arrest. *United States v. Garcia*, 848 F.2d 58, 59-60 (4th Cir. 1988). Two factors govern the determination of probable cause in a given situation: "the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992). Probable cause "could be lacking in a given case, and an arrestee's right violated, either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both." *Id.* Further, because "the reasonableness of a seizure under the Fourth Amendment should be analyzed from an objective perspective[,] . . . the subjective state of mind of the defendant, whether good faith or ill will, is irrelevant[.]" *Brooks v. City of Winston-Salem*, 85 F.3d 178, 184 n.5 (4th Cir. 1996).

### a. Claims Against Chief Manger

Plaintiff includes Chief Manger in Counts I and II on a theory of *respondeat superior*. "Under the doctrine of *respondeat superior*, an employer is jointly and severally liable for the torts committed by an employee acting within the scope of his employment." *Southern Mgmt. Corp. v. Taha*, 137 Md.App. 697, 719 (2001), *vacated on other grounds*, 367 Md. 564 (2002), *remanded to* 378 Md. 461 (2002) (citing *DiPino v. Davis*, 354 Md. 18, 47 (1991);

*Oaks v. Connors*, 339 Md. 24, 30, (1995); *Tall v. Board of School Comm'rs*, 120 Md.App. 236, 251, (1998)).  "An employee's tortious conduct is considered within the scope of employment when the conduct is in furtherance of the business of the employer and is authorized by the employer." *Tall*, 120 Md.App. at 251.  The role of a chief of police with respect to subordinate police officers is that of a managing co-employee, not an employer, for purposes of *respondeat superior*.  *See Baltimore Police Dept. v. Cherkes,* 140 Md.App. 282, 332-333 (2001).

> Ordinarily, an employee is not vicariously liable for the tortious conduct of a co-employee. *See Jones v. City of Los Angeles*, 215 Cal.App.2d 155, 158, 30 Cal.Rptr. 124 (1963) (noting that a chief of police may not be held liable for the wrongful acts of subordinates not done at his discretion) (citing *Michel v. Smith*, 188 Cal. 199, 205 P. 113 (1922)); *Brown v. City of Shreveport*, 129 So.2d 540, 544 (La.App. 1961) (refusing to hold a police chief vicariously liable for the actions of police officers) (quoting *Gray v. De Bretton*, 192 La. 628, 188 So. 722, 724 (1939)); *Moser v. Bertram*, 115 N.M. 766, 858 P.2d 854, 856 (1993) (holding that co-employees are not liable for each other's conduct) (citing *Norwest Capital Mgmt. & Trust Co. v. United States*, 828 F.2d 1330, 1344 (8th Cir.1987).

*Id.*  A managing employee, such as Chief Manger, may be liable for a co-employee's tortious conduct if he participated in or directed the conduct.  *Id.*  A managing officer cannot be held liable for the misconduct of a subordinate employee unless the act is done "with his consent or under his order or direction." *Tedrow v. Deskin*, 265 Md. 546, 550-51 (1972) (citations omitted); *see also Green v. H & R Block, Inc.*, 355 Md. 488, 503-12 (1999) (holding that there was no basis for imposing vicarious liability on a corporate

official for the tortious conduct of a co-employee when the official was serving in a managerial capacity and did not engage in any affirmative conduct).

In this case, Plaintiff did not allege any affirmative conduct by Chief Manger that resulted in his false arrest or false imprisonment.  Accordingly, Plaintiff may not rely on the principles of vicarious liability to hold Chief Manger liable for the torts of the individual police officers.  Summary judgment on Counts I and II will be granted to Chief Manger.

### b.  Claims Against Montgomery County

Montgomery County is not liable for any intentional torts committed by the officers because such torts would have been committed while the officers were acting in a governmental capacity, and a local government entity such as Montgomery County is immune from liability for tortious conduct committed while acting in a governmental capacity.

The Fourth Circuit, applying Maryland law, concluded that a "[c]ounty enjoys governmental immunity with respect to the claims that seek to impose *respondeat superior* liability for an intentional tort committed by [a police officer]." *Gray-Hopkins v. Prince George's County, Md.,* 309 F.3d 224, 234 (4th Cir. 2002). Under Maryland law, a county "is immune from liability for tortious conduct committed while the entity was acting in a governmental capacity." *Id.* (citing *DiPino*, 354 Md. at 47-48).

In *DiPino*, a municipal police officer was sued for multiple intentional torts. The plaintiff also sought to impose *respondeat superior* liability on the municipality for those torts. The Maryland Court of Appeals held that the municipality was entitled to governmental immunity because the officer was alleged to be performing a governmental function. 354 Md. at 47-48; *see also Town of Port Deposit v. Petetit*, 113 Md.App. 401, 420 (1997) (holding that the Town was entitled to governmental tort immunity for torts committed by the Chief of Police arising out of governmental activity).

Assuming that Officers Smugeresky and Lumsden were acting within the scope of their employment so as to render *respondeat superior* applicable, they were performing a governmental function. *DiPino,* 354 Md. at 47-48 (holding that law enforcement is a governmental function). Therefore, Montgomery County is entitled to governmental immunity from liability for any intentional torts committed by Officers Smugeresky and Lumsden. Summary judgment on Counts I and II will be granted to Montgomery County.

### c.  Claims Based on Officer Smugeresky's Actions

Plaintiff does not produce evidence that the initial encounter with Officer Smugeresky satisfies the essential element of "deprivation of the liberty of another." Officer Smugeresky approached Plaintiff and asked to see his identification. As discussed *supra*, a Fourth Amendment seizure does not occur simply because a police officer approaches an individual and asks a few

46

questions.  *Bostick*, 501 U.S. at 434-435.  Because Officer Smugeresky did not seize Plaintiff, he likewise did not deprive Plaintiff of his liberty.  The court will grant summary judgment to Defendants on Counts I and II with respect to Officer Smugeresky's initial encounter with Plaintiff.

Plaintiff also fails to support factually the claim that Officer Smugeresky unlawfully detained him, resulting in his false arrest and imprisonment.  Plaintiff contends that he was unlawfully detained when Officer Lumsden retained his driver's license after he repeatedly requested its return.  Plaintiff offers no evidence showing that Officer Smugeresky caused Plaintiff's deprivation of liberty vis á vis Officer Lumsden's retention of Plaintiff's driver's license.  Officer Lumsden's testimony that he retained Plaintiff's driver's license because he was not sure whether Officer Smugeresky "was done with" Plaintiff yet is not proof of Officer Smugeresky's culpability.  By contrast, had Plaintiff offered evidence that Officer Smugeresky instructed Officer Lumsden to retain Plaintiff's driver's license after Plaintiff requested it back, that would have provided stronger support for his claim.  But, there is no such evidence and the court will grant summary judgment to Defendants on Counts I and II with respect to Officer Smugeresky's unlawful detention of Plaintiff.

Plaintiff does, however, come forward with sufficient evidence to defeat Defendants' motion for summary judgment with regard to his arrest by Officer Smugeresky.  Plaintiff unquestionably

satisfies the first two elements of the torts as he was deprived of his liberty when Officer Smugeresky handcuffed him and he did not consent to his arrest.  If the facts as alleged by Plaintiff are true, he also satisfies the third element, that Officer Smugeresky arrested him without legal justification.

Officer Smugeresky arrested Plaintiff for second degree assault.  Assault has been defined as "either [ ] 'an attempt to commit a battery'" which is "the unlawful application of force to the person of another," or "an intentional placing of another in apprehension of receiving an immediate battery." *Cain v. State,* 386 Md. 320, 338 (2005)(quoting *Snowden v. State*, 321 Md. 612, 617 (1991)).

It is undisputed that Defendants initiated contact with Plaintiff when Officer Lumsden pushed Plaintiff in the chest. Defendants testified that they saw Plaintiff "lunge" at Officer Lumsden twice, once with his arm extended, and believed Plaintiff was about to strike Officer Lumsden.  While Plaintiff admits that he stepped toward Officer Lumsden twice, he maintains that he was calm throughout the encounter, that his hand was at least a foot away from Officer Lumsden when he was tackled, and that his arm was outstretched in a way that indicated he was merely requesting that his driver's license be returned.  (Paper 32, Ex. 4, Franklin dep. at 110-111).  The nature of Plaintiff's movements is material to whether the officers had probable cause to believe that Plaintiff was committing an assault.

48

> [I]f the facts, and the inferences to be drawn therefrom, relied on to constitute probable cause are clear and undisputed, the question is one of law for the court; where the facts are contested, however, whether they are proved is a question for the jury . . . . Thus, when contested facts generate a jury issue, 'the jury, after being instructed as to what constitutes 'probable cause,' . . . should be left to determine its presence or absence.

*Exxon Corp. v. Kelly*, 281 Md. 689, 697-98 (1978). The facts relied on to constitute probable cause in this case are disputed, rendering summary judgment as to whether Officer Smugeresky's arrest of Plaintiff constituted false arrest and/or false imprisonment inappropriate.

### d.   Claims Based on Officer Lumsden's Actions

Plaintiff has produced evidence sufficient to defeat Defendants' motion for summary judgment with regard to Officer Lumsden's detention of Plaintiff. As discussed above, if the facts as alleged by Plaintiff are true, under the totality of the circumstances, Officer Lumsden's retention of Plaintiff's driver's license after Plaintiff repeatedly requested its return transformed the consensual police-citizen encounter into a Fourth Amendment seizure. Officer Lumsden's "seizure" of Plaintiff constitutes a "deprivation of the liberty of another," the first element of both torts. As to the second element, Plaintiff maintains that the encounter was never consensual, but even if it was, he revoked whatever consent he may have given when he demanded that Officer Lumsden return his driver's license. Finally, Officer Lumsden

detained Plaintiff without legal justification because he lacked reasonable suspicion that Plaintiff was engaged in any criminal activity.  Accordingly, the court will deny Defendants' motion for summary judgment on Counts I and II with regard to Officer Lumsden's detention of Plaintiff.

### e.  Common Law Privilege

Defendants attempt to invoke a state common law privilege defense.  Their reliance on this privilege is misplaced because the defense is inextricably linked to whether the officers' actions were legally justified based on the circumstances presented.  *See Shipley v. State*, 243 Md. 262, 264-65 (1966) (affirming the defendants' convictions and finding that police officers were justified in stopping the defendants and peering into their car for dangerous weapons where the car was parked near a synagogue after midnight, it had been there more than ten minutes for no apparent reason, and there had been a rash of crimes, including burglaries, in the neighborhood).  Here, Plaintiff offers evidence sufficient to raise a genuine issue of fact as to whether the officers' actions were legally justified, i.e., that Officer Smugeresky had probable cause to arrest Plaintiff and Officer Lumsden had reasonable suspicion to detain Plaintiff.  Thus, Defendants are not entitled to summary judgment on these claims based on a defense of privilege.

### 2. Battery (Counts III and IV)

Count III alleges that Officer Smugeresky committed a battery, presumably based on his tackle of Plaintiff.  Count IV is also a battery claim against Officer Lumsden, presumably based on his use of the Taser on Plaintiff.  A battery is "an offensive, non-consensual touching – the 'unlawful application of force to the person of another.'"  *Katsenelenbogen v. Katsenelenbogen*, 365 Md. 122, 131 (2001) (internal citations omitted).

Officer Smugeresky directly and offensively touched Plaintiff when he tackled him.  The issue here is the lawfulness of the touching.  Whether the touching was lawful depends on whether the officer's actions were "objectively reasonable in light of the facts and circumstances confronting [him]." *Graham*, 490 U.S. at 397.  Officer Smugeresky purportedly tackled Plaintiff because he feared that Plaintiff posed an imminent harm to Officer Lumsden. Plaintiff testified that he was two to three feet from Officer Lumsden when he stepped forward slightly, with his arm outstretched to request that his license be returned, and thus did not present a danger to Officer Lumsden.  Construing the facts in the light most favorable to Plaintiff, Officer Smugeresky's tackle was objectively unreasonable.  Thus, Plaintiff has presented sufficient evidence to support his claim of battery against Officer Smugeresky and the court will deny Defendants' motion for summary judgment on Count III.

Officer Lumsden indirectly touched Plaintiff in a harmful or offensive manner by deploying his Taser, which projected two

electrical probes into Plaintiff's back.   A battery may occur through a defendant's indirect contact with the plaintiff. *Nelson v. Carroll*, 355 Md. 593, 600-601 (1999) (holding that defendant committed a battery when he struck plaintiff on the side of his head with his handgun).   "Likewise, an indirect contact, such as occurs when a bullet strikes a victim, may constitute a battery." *Id.*   If true, the facts as alleged by Plaintiff show that Officer Lumsden's use of the Taser was unlawful.   Plaintiff testifies that Officer Lumsden deployed his Taser within seconds of taking Plaintiff to the ground.   Defendants testified that Officer Lumsden delayed using his Taser, and only did so because Plaintiff refused to comply with the officers' commands.   Thus, a question of fact exists as to whether Officer Lumsden's use of the Taser was reasonable under the circumstances.   Plaintiff has presented evidence sufficient to support his claim of battery against Officer Lumsden and the court will deny Defendants' motion for summary judgment on Count IV.

Defendants submit that they should receive the benefit of the common law doctrine of privilege, which they maintain is applicable where "a defendant alleged to have committed an intentional tort has acted in furtherance of an interest of legitimate social importance." (Paper 32 at 35).   Defendants' privilege defense is unconvincing.   Defendants point to and the court can find no Maryland case law recognizing a privilege defense to battery where a police officer's actions were not legally justified.   In fact,

the treatise that Defendants cite describes a "privilege" as "any circumstance *justifying* or excusing a prima facie tort." W. PAGE KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 16 (5ᵗʰ ed. 1984) (emphasis added).   The facts surrounding whether Defendants' actions were legally justified are disputed and thus cannot form the basis for a grant of summary judgment based on a defense of privilege.

### 3. Malicious Prosecution (Count VI)

Plaintiff's claim against Officers Smugeresky and Lumsden for malicious prosecution requires him to show (1) the defendants instituted a criminal proceeding against the plaintiff; (2) the criminal proceeding was resolved in the plaintiff's favor; (3) the defendants did not have probable cause to institute the proceeding; and (4) the defendants acted with malice or a primary purpose other than bringing the plaintiff to justice. *Okwa v. Harper*, 360 Md. 161, 183 (2000) (citing *DiPino*, 354 Md. at 54).

Defendants concede the first two elements, that the officers instituted a criminal proceeding against Plaintiff which was resolved in Plaintiff's favor.   As discussed above, if taken as true, the facts alleged by Plaintiff are sufficient to show that Defendants lacked probable cause to arrest him, satisfying the third element. *See Okwa*, 360 Md. at 188 (using officers' probable cause to arrest as its analysis of probable cause to institute proceedings).

Finally, Plaintiff offers evidence that Defendants acted with malice.   "Actual malice does not always have to be shown with

specificity; it can be inferred." *Leese v. Baltimore County*, 64 Md.App. 442, 480 (1984). Officer Smugeresky's impression of the group when he initially viewed them was that they were "antipolice." (Paper 37, Ex. 1 at 22). Officer Lumsden described the group as "hostile, as usual" and stated that they were "talking trash about the police." (*Id.* at 43). In evaluating an arresting officer's actions, "[a] fact-finder may consider a history of animosity or 'personality conflict.'" *Leese*, 64 Md.App. at 480-481. Also, Officer Lumsden allegedly responded to Plaintiff's repeated requests for his driver's license by telling him to "shut up" and calling him a "jackass." A plaintiff is entitled to have a fact-finder resolve the distinction between "acceptable assertiveness" and disrespectful conduct. *Okwa*, 360 Md. at 192. Moreover, given the stark contrast between the versions of the event, Plaintiff is entitled to argue that the officers charged him with assault "as a means of insulating [themselves] from liability" for their earlier actions, as in *Hines v. French*, 157 Md.App. 536, 557 (2004). Accordingly, Plaintiff has proffered evidence sufficient to raise a genuine issue of fact as to whether the officers acted with malice in instituting criminal proceedings against him. Accordingly, Defendants' motion for summary judgment on Count VI will be denied.

## IV.   Conclusion

Plaintiff's cross-motion for summary judgment will be denied on all counts.   Defendants' motion for summary judgment will be granted in part and denied in part.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge